We are on a presentation of documents this morning, student badge 45-0213, D. M. Snyder, plaintiff's appellant, Gurnee Police Pension Board, Benedictine family. Our new one on behalf of the appellant, Mr. Brian G. Smith. Our new one on behalf of the appellant, Ms. Laura J. Goodwell. Mr. Smith. Good morning. Good morning, Your Honors. May it please the Court, counsel. I represent Brian Smith. I represent Mr. Snyder in this matter before Your Honors. The real issue before the Court this morning is whether or not the pension board's decision is against the manifest weight of the evidence, finding that my client was not disabled from service as a police officer. Understanding the high bar that the manifest weight of the evidence certainly puts on us, I think what is evident from both the board's decision and looking at the medical records is that the board's decision relies upon only the evidence that it felt, and I think admitted to in its argument, that bolstered its decision. It used that word bolstered, indicating from the language of that decision that it was selectively choosing evidence that wanted. Now, in a vacuum, I suppose saying we believe this evidence is more persuasive would be one way to argue it, but to dismiss as it did the functional capacity exam of Dr. Glenn, excuse me, and to essentially dismiss the third eye in me, Dr. Bergen, in the manner that it did shows that it was acting in an arbitrary manner. We don't re-weigh the evidence at this level, correct?  So the findings and conclusions of the administrative agency on questions of fact. Yeah. Yeah, the prime facia, true and correct, correct? Correct. So we can get past that. Yeah, sure. And what I think, what is evident here is looking at the manner in which those were applied, though, is to say we have two IMEs that found in favor of or found him to be not disabled. One found that it was. Equivocal in saying I can't substantiate why this would be disabled. Not that, like, there's no fracture here. He's fine. He is not disabled. Maybe that's the ultimate. What he says in the end of his, in the questions he's asked by the board, I think, again, given the evidence that we see here, you know, he's saying there's still a fracture here, and notably both Graf and Mohan, despite finding him not disabled, don't say he's not in pain. This is malingering. This is someone who is not clearly, clearly not injured or, I guess, in pain. Again, I get to, maybe that's a distinction with or without a difference here that everyone seems to agree that he's suffering some form of pain because we look at the medical records that go all the way up to about a week, week and a half before he retires saying he's still undergoing treatment. These medial branch blocks, facet injections, discussion of kypoplasty, which my understanding is that is essentially injecting cement into his spine. So even if we take the two IMEs and say, well, he's not disabled, this is to say, if you agree he's experiencing pain and he's still undergoing all of these forms of treatment, sort of where does that leave us? The question would be is the pain, does the pain preclude him from doing his job? I guess it's the question that they talked about. You mentioned Dr. Glynn's findings. Didn't the court basically dismiss his findings saying they weren't credible or something to that effect? They basically dismissed his findings. Yes, Justice Chomsky. They said they gave him no weight. It wasn't even a we don't find this persuasive because the IMEs that all reviewed his reports said, okay, we disagree with the way the functional capacity exam was conducted or one of our findings about his ability I think was the strength in his lower legs doesn't match with our findings. I think something along those lines is a fairly subjective thing. Much like any of these things with a low back injury, something we don't have a blood test or a respiratory test for a firefighter, for example, where we could say it's either yes or no, it's black and white. Obviously these sorts of injuries are always somewhat reliant on subjective evidence. Again, I think going to all of these treatments that were going on subsequent to his being released to work is the board heavily relies on Dr. Sitow's release to work, which was I believe he saw him February 10th. Dr. Sitow saw him once. You're essentially you are asking us to take a look at the evidence and see whether or not there's sufficient evidence in the record to support the board's conclusion. Yes, Your Honor. You cite Kazukas in your reply brief, but that case is distinguishable, correct? I mean, if you look at that case, the doctors in that case, all of the doctors said they observed objective evidence of muscle spasms. In this case, unlike Kazukas, the doctors disagreed with each other. In Kazukas, all of the doctors were unanimous that Plaintiff was disabled. That's not the case here, right? Correct, Justice Berkowitz. I think there where I got a distinction would be that, well, for example, I think in Kazukas they were saying, look, there were some back spasms and other things just in, again, these sort of standard. And there was objective evidence of it. And there was. And I think here what's notable is that despite Dr. Graff and Mohan finding him not disabled ultimately and saying some of these issues weren't present, they're not saying, you know, there's nothing in the record anywhere, frankly, that says they don't believe him. There doesn't seem to be, like, whether it's explicit or even implicit, really, that Mr. Snyder's, whether it's his testimony or what he was telling the doctors at the time, which I suppose would be more relevant at that point, is he's not faking this. This isn't, you know, are we seeing the same level of disability or physical outward symptoms that are measurable as is in Kazukas? Perhaps not, because as, Justice Brigg, as you note, I think in Kazukas the doctor said there was the paraspinal spasms and things of that nature that are present in some of these evaluations and not others. But we don't have the doctors ultimately saying, you know, are you just faking this? Like, I don't believe you. At one point he told, Mr. Snyder told Dr. Dudzinski that he's definitely improving and very eager to return to work. When was that? I believe that was in, because he was returned to work in, I believe either late February or early March. So it was early on. It was earlier on. Certainly before we get to what appears in the record is that we have a fairly compressed time period. He was injured January 3rd and he retires July 9th, I believe the date is, but mid-July. There was some improvement, but I think that's consistent with what we see in the medical treatment records and what I think we know from other cases of this nature and just I suppose to some extent common sense would tell us, something like a muscle strain that isn't necessarily a linear improvement. He testified that he rides a recumbent bicycle for exercise. He jogs with his son and is a handyman around the house. He did, and I think I addressed that in my briefs, probably both the appellate brief and the reply brief, is ultimately here it's not whether or not he is late up in bed and is in traction. Can you do the job of a police officer? It's uncomfortable for him to sit eight hours a day. And the village requires him to sit in a patrol car. He was a patrol officer. He's a field training officer. Whether he's a field training officer or not, if he's on patrol, we know that means he's sitting in a car, and he testified to that, that he sits in a car for essentially an entire shift. Maybe not every time he's on duty, but many days that's what patrol officers are required to do. Not only does he sit in a patrol car, as you said, that's one of the biggest issues that he had was for sitting for long periods of time, A, that caused pain just in and of itself, but also the then requirement to get up quickly, and if you've got to arrest someone, chase someone down, even just getting out of the car to issue a speeding ticket to a motorist requires you to get up and move smoothly to a car. And if you're hurt, whether it's a tingling pain, you're bent over because your back seizes up, that puts the officer at risk. All these arguments were made before the board, correct? They were. And you suggest that we should carefully consider Dr. Brogan's opinion because his answers were, quote, most directly and, emphasis added, most credibly. So you're asking us to compare that testimony and say that his testimony is more credible. Well, so perhaps my use of credible wasn't meant to be in a legal term of it, but saying more applicable to what a patrol officer in Mr. Snyder's case is asked to do. I think that's why I think I know we discuss or the response discusses, well, it's in the, you know, the questions we give to the IMEs to discuss with the officer his duties and what he does and all that. But Dr. Brogan, the one who notably finds my client not to be, I'm sorry, to be disabled, actually addresses it in his answers and says, look, he would lose control of his gun if he has to grapple with someone. And notably, it's both from that IME and in Snyder's testimony and throughout the medical records of different doctors, the issue of the duty belt. He has to wear the duty belt to do his job as a patrol officer. And that was the issue in Kazookas, right, that she could not wear the belt. Right. And it's even, I think, both in his testimony and it's mentioned to one of the doctors, and I apologize, I don't remember which one offhand, that he attempted to build his tolerance going, I would characterize that as above and beyond. If I wear this almost like progressive overload with like lifting weights of if I wear it for a little longer every day, maybe I'll get over this. Maybe I'll be able to wear the belt for periods of time. And he's talking about adjusting it and wearing it a different way. You certainly can't say that my client didn't do everything he could to try to get beyond this, I think, in that very specific instance to say that wearing the duty belt is clearly required. I mean, you look at the job description. I don't know if the job description itself specifically mentions the duty belt, but I think it's accepted that an officer has to wear a duty belt to be armed to conduct his job as an officer unless he's working in, you know, an administrative role in the department only. And that's clear throughout the medical records that that is one of the biggest problems, is that putting the duty belt on, the pull on, I assume it's, you know, with the lower back and aggravating the pain in the core is what creates that issue. So I think that's that. And then looking at Dr. Glynn's testing of his ability, not just simply in the other IMEs, okay, can you squat and stand up? Can you walk on your toes? Can you walk on your heels? And that's notable in that I think it's Dr. Didinsky had him do the exact same test in January. I believe it was January 27th. It was word for word almost. Can you walk on your heels? Can you walk on your toes? Can you squat and rise? Did Bergen have him address other police job duties more so than the other IMEs? He did because in his answer he discusses specifically, again, they don't put word for word. There's not a transcript, of course, of what they talked about. But that Dr. Bergen, in his answers to the ultimate questions posed to him by the board, said directly addressing his ability to protect his weapon to arrest someone. The other doctors, the IMEs, Mohan and Graff, never did that. And where I think, again, Dr. Glynn, I understand he's not one of the three IMEs here, but that testing of saying, okay, you can squat and stand up in a matter of two, three seconds, putting him through that, and I think it's Dr. Graff saying it was 20 minutes. Yes, I was with him. Dr. Glynn spent two hours with him. Now, you can argue with some of what he testified to, perhaps, or some things, but to say spending that amount of time and putting through things that would fatigue him. Was there any evidence that Officer Snyder tried air cushion or anything of that nature to try to ease the pain? I know that a lot of truck drivers, a lot of people who get injured will use an air cushion. Was there any evidence that he tried to accommodate his or tried to reduce the pain? I'm not recollecting specifically an air cushion in his thing. I think it was more about the do-go-full. The air cushion, I understand, you can sit on it, and perhaps it would change how much you're sitting. It's going to protect that portion of his backside where the injury is. Right. Well, and if it's the L2, sort of in the low back, he did, and there was a point there where he was wearing a brace, something else to sort of stabilize the area. Would that have the same effect or help in the same way an air cushion would? That I couldn't say. I don't think air cushions, specifically Justice Burkett, is anywhere in the record. But I think the duty belt thing is probably the biggest thing we can point to and say he tried to do something to adjust wearing in a slightly different way, building up his tolerance at home when certainly not required to do that. What's the weight of the duty belt? I don't believe it's 15 to 20 pounds fully loaded. I mean, I believe that's in the record, but I don't want to say for absolute certain that that's. I think you're right. But I believe that's approximately what a standard duty belt would weigh, you know, if there's other things. But, again, I think that, and then looking at Dr. Glenn's review of him, saying, when you put him through fatiguing testing, that shows more relative to what he would do during his job. That is something that I think, given that testing, given what Dr. Bergen testified to, or I mean, sorry, put in his opinion, that was more, that evidence is the most credible evidence we have. Now, again, I understand what the burden is here in saying that, you know, looking at this, but saying when the board selected to say we're going to only essentially consider the evidence to give it any weight. Your reply brief suggests that their treatment of Dr. Glenn was an abuse of discretion. You cite Port and Castle for that. That case was about a municipality wanting to intervene on, I think, a duty pension issue, and the appellate court found that was an abuse of discretion not to allow it. But how is Port and Castle like this? Certainly, just more in the facts there of that specific issue. That is not what's at issue here, but if I could finish my answer. The issue in Port and Castle and the line from there is about ignoring a critical issue. I think that's worth saying. Dr. Glenn tested the weight of what was put on him, and more accurately tested it. And to just say, no, we don't agree with his ultimate conclusion, but we're just not going to consider what he wrote is where I was taking that from, to say that's an abuse of discretion. Thank you. You have an opportunity for rebuttal, Mr. Smith. Thank you. You may proceed. You may please support. Good morning, honors. My name is Laura Goodlow. I represent the appellees in this matter. As you're aware, this is an administrative review, not to reeducate the court, but I think it's very important to point out that it is true within the providence of the pension board trustees to report weight to the evidence and testimony before it, and the proper standard of review is a manifest weight standard of review. And so long as there's competent evidence in the record to support the board's decision, it should be affirmed. Ms. Goodlow, how about if the board didn't take certain things into consideration, i.e., the fatigue testing by Dr. Glenn and there was no fatigue testing by anyone else? Or Dr. Glenn, the only one testing him regarding the weight of the duty belt. I mean, how would that at that point, can we say, oh, well, they didn't take into consideration this information. Can we then take it into consideration in our ruling? I believe that the board did take it into consideration. It ultimately did not accord weight to it. I think that's the difference here. The board reviewed the report. The board took that report, gave it to the IME providers for their supplemental opinion to ensure that we had a full and complete record. The board listened to Kyle Prakter-Glenn's testimony and ultimately did not want to accord weight to his opinion for numerous reasons. We see the three IME providers who reviewed this report have a bunch of commentary in response. Dr. Graff noted that the findings were flawed, that it was not a valid FCE. He also noted that they were utilizing an AMA impairment rating, which is contraindicated for purposes of making determinations as to disability. He also noted that during his evaluation with respect to strength, he was a 5 out of 5, whereas Glenn reported that he was a 3 out of 5, which means he could not stand against gravity, which makes no sense given the fact that this is an active person. But is there a difference between him being a 5 out of 5 on strength, and that may be him lifting his leg and putting weight on it, versus wrestling a defendant to the ground? There's certainly a difference, and we do see functional capacity evaluations in disability adjudications. However, we also have three orthopedic surgeons who, a part of their practice, is providing independent medical evaluations that take into account the job description, the duties and obligations of police officers, and they perform medical evaluations that they deem to be satisfactory in providing an empirical response or, you know, a conclusion as to whether or not somebody can perform unrestricted police duty. And I would presume that these doctors who have performed IMEs over and over again know exactly what they're looking at when they're looking at not only the diagnostics and they're doing the physical examination. So I feel as though these IME providers, and particularly Dr. Mohan and Dr. Graff, did their job here, and we can rely upon that and not rely upon an invalid FC that these three IME providers have never seen a chiropractor perform in their experience. Well, they relied on Sid Tower, his statement. But his statement was in February 22, and he had only seen Mr. Snyder one time. There was a lot of treatment after that, and there were more opinions. How do they give weight to Sid Tower? I think they give weight to Sid Tower because of the fact that this gentleman was injured in January of 2022, stopped treatment at the end of May of 2022. So we have a very small window of opportunity to review medical records in support of the condition that he was being treated by. We have Dr. Sid Tower and Dr. Dudinsky both putting in their medical treatment notes that they feel he could return to full and unrestricted duty. These two doctors saw the appellant closer in duration of time to the actual injury, and they thought that he was doing well. And he actually self-reported to these providers, too, that he felt like he was almost 90 percent better, that he wanted to go back to work. And so I don't think it was outside of the realm of possibility for the pension board to record weight to those opinions because they coincide or conform with the ultimate conclusions of Dr. Mohan and Dr. Graff. I would like to just go on and make a couple additional points. Dr. Mohan and Dr. Graff are board-certified orthopedic surgeons. Both unequivocally rendered this individual not disabled from service. Just because they didn't go on to talk about what restrictions the appellant would have, it doesn't make any sense because if they're concluding that he's not disabled, they're not going to talk about a duty belt. They felt that he was... But, I mean, there's something being disabled, and there's something being disabled in doing his job, right? Correct. So, I mean, that's what we're here about. That's what he was there about. So why wouldn't they talk about his disability in performing his job duties? I believe they did. If you would look at their cover letters I sent to all three providers, I asked each and every provider to discuss with the appellant his perceived limitations, discuss with the appellant his job duties and what's causing him to have filed for disability. I feel like all those providers took that into consideration. I also feel as though those providers provided a very detailed medical analysis. They provided a very detailed medical recitation that the applicant at the time confirmed was accurate. And so I feel like these doctors did their job. And, ultimately, we have a split case here where we have Dr. Mohan, we have Dr. Graff, we have Dr. Bergen. There's no way that my board could accord weight to Dr. Mohan and Dr. Graff and then accord the same weight to Dr. Bergen because there's a difference in opinion. And, again, it's purely within their province to rectify those, you know, those issues in the record. And they ultimately found that the totality of the evidence, with the four corners of what we had in terms of testimony evidence, supported that finding that he's not disabled. I also believe that the timeline bolsters the fact that the disability determination was not against the manifest weight. This gentleman was injured in January. He sought medical treatment until the end of May. At the end of May, he had a second MRI that showed that he was improving, so some additional diagnostic testing that shows he's getting better. He then unilaterally decided to file for disability and also file for retirement pension. However, he didn't have the age yet to go into pay status. And so I think he made the decision that he was going to be done with police service, and that's perfectly acceptable. He testified that he was a handyman around the house, that his wife had switched positions, so he was trying to do, quote-unquote, construction stuff around the house. And the rest of that, most of the time, the most I can do is jogging with my son. And I think it's called the recumbent bike where I have it at home, so I try to get some exercise. He said he enjoyed being a stay-at-home dad with two kids. And I think that coincides with the board's ultimate conclusion. I clearly understand that those activities are not the same duties as a police officer. But they are activities. They are activities. I mean, I can't jog very far, I can tell you that much. But I know that those activities, to me and to the pension board, coincide more so with Dr. Mohan and Dr. Graf's opinions. And I didn't mean in my decision order to use the language that he's claiming sounds as if the board was just cherry-picking information. We weren't. We're looking at the entire record. And I feel like everything in the entire record points to the conclusion that the board reached. And he's looking for business opportunities. He wants to start his own business. Correct. That as well. And I'd like to point out, too, that in trying to persuade you that Dr. Mohan and Dr. Graf's opinions are incorrect, he's citing to a number of cases that just are totally the opposite. One case is the Wade case. My late father was on that case. He lost. I hadn't heard about that case for years and years and years. I know that in Wade, Dr. Milgram had a ton of flaws in terms of his report, misstatements of facts, not looking at certain medical records, same with Hampton. This didn't occur here. The appellant himself certified that the medical recitations provided were accurate. There's no glaring discrepancies like in Hampton or like in Wade that would dissuade this court towards upholding and affirming the decision. And finally, I'd like to just point out that in the recent Moreland case, I believe that that supports the board's decision as well. In that State Supreme Court case, we had an individual who had multiple treatment records, had diagnostic imagery confirming that he had a lumbar disc problem. We had work comp IME providers who certified that there was an issue. And then we had the pension board's sole IME provider, Dr. Levin, who said that this individual is not disabled. The board gave proper analysis to Dr. Levin's opinion, and ultimately the State Supreme Court affirmed it for the basis that we're standing here today, that so long as there's competent evidence in the record to support the board's decision, it should be affirmed. What I think is happening here today is that counsel for the appellant is asking you to reweigh the evidence. It's actually kind of accusing me of doing what it kind of is doing in terms of cherry-picking bits and pieces of information, putting it together like Humpty Dumpty, and then overturning the board's decision. And that really is not the court's process here. And so for the reasons I've stated, I respectfully request that the board's decision be affirmed, and I thank you so much for your time. Thank you. Mr. Smith. Thank you again. In response to Ms. Goodloe's argument there, I think what draws our attention to why the decision against the man investigative evidence is the reliance to move beyond the IMEs for a moment is Dr. Sitow and Dr. Dudinsky. It relies on Dr. Sitow and Dr. Dudinsky in its ruling saying they returned to work. Dr. Sitow, as we discussed moments ago, only saw him once, February 10th. That is several months prior to the ultimate date of retirement. And as you just noted, there was quite a lot of medical treatment between now and then. So to say he went back to work in one instance, was returned to work or full duty, I don't know that that really bolsters the opinion in the way that it would be to say that this is somehow bolstering in conformance with what the IMEs have found. And then Dr. Dudinsky returned to work in February, and then I believe April 1st. But again, the record notes that Dr. Dudinsky on June 30th noted that Mr. Snyder's back pain was debilitating and that he couldn't do the job duties. So again, I think trying to say we're relying on these opinions or these orders from the doctors to say you can go back to work when the situation, clearly the medical records have changed, again goes to, is that against manifest way to the evidence to say this is what we're basing this on? When these doctors, ignoring when they made those decisions or those orders and those opinions, that they said, well, in February you can go back to work. April 1st you can go back to work, but on June 30th you're having debilitating back pain. And again, he's seen Dr. Marsiglia and other places for all these other treatments. Clearly, again, if this was just made up out of whole cloth, would these other doctors have been treating him for these things and actually giving him injections and doing these things that addresses that pain? So I think that goes to the board using those two treating physicians as weight for their opinions. But again, it's totally out of context for when this decision was made and what happened afterwards closer again to the period of retirement. Well, her point is that he's in this position, this situation, just months after the injury when he saw Sital. And Sital is like, hey, he's looking good. He's, you know, doing well. So her point is within six months or whatever down the road, the IMEs and the other doctors are saying, yeah, he's ready to go. So your question is, well, Sital only saw him on time, but he did see him closer to the incident. So he's getting worse, is your opinion? It would appear from the medical records. I think that while maybe there was some initial pain really from the initial acuteness of the injury, and again, none of us are doctors, I suppose, here, but it would certainly seem to the reading of medical records that the initial pain may have gone off and that was there some improvement in range of motion and things like that? Yes, it improves the total amount of pain. But that doesn't mean, again, that this is a linear process, that he's getting better. And I can't go into the doctors that were treating him. It's clear that if they – I don't know how we could say, well, if they were treating him and they thought he was malingering, like, look, he's just trying to get pension. He's just trying to do this because he doesn't want to work. And we're talking, Jessica, you were asking questions about what were his post-retirement plans. Ignore for a second the, okay, well, can he do the job duties versus can he ride a bike or hammer some nails or something. Clearly different things. But to say nothing else in the record, nothing that's there objectively, when they were treating him all the way up until I think it was the first week of July, would indicate they thought he was malingering. He was treating physicians. They were offering kyphoplasty or at least discussing it, injections into his back, things of that nature. So I think that is evidence that it wasn't as though he was like, well, if I buy my military time back, I can just retire out and I'll get this disability pension for a while. At some point, we said the credibility of those doctors that were treating him would have said, no, we're not going to give you – we're not going to inject something into your back, whether it's cement or a facet block or something else, when we think you're making this up. So I think that and then given, again, the ultimate issue here, I think, is his inability to do the job as a police officer. And I think where the board opinion falls short is that those two IMEs that found him not disabled really didn't address it. Is it in there? Is it in the questions they were asked? Yes. But Dr. Bergen specifically addressed it. Dr. Glenn did the testing that would more directly address it. That's what shouldn't have been so easily discarded as giving it no weight. So I think that's where it becomes against the manifest way of the evidence to say this evidence that was more correctly reviewed, what the ultimate issue was, was found to not just be, well, we don't find this persuasive, it's we're just basically not going to consider it. So given all that, I would ask that the court find and reverse the board's decision. Thank you. Thank you, Mr. Smith. Any questions, Justice Leberkamp? Ms. Smiley? Have a good day, folks. Thanks for your arguments. We'll take this case under advisement and render a decision in due course. Court is in recess until our next oral argument. Safe travels.